# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re: | |
| FRANCES MARIA FLOOD, | Case No.   13-10953-RGM<br>(Chapter 7) |
| Debtor. | |
| CLEARONE COMMUNICATIONS, INC., | |
| Plaintiff, | |
| vs. | Adv. Proc. No. 13-1149 |
| FRANCES MARIA FLOOD, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

In this case ClearOne Communications, Inc., seeks to determine that an obligation for $3,389,992.35 in legal fees and costs advanced on behalf of Frances M. Flood, its former chief executive officer, in connection with various shareholder derivative suits filed against her and her unsuccessful defense of a federal indictment is not dischargeable.

Flood stated in her August 27, 2003 letter to ClearOne requesting indemnification and advance reimbursement of reasonable costs and expenses that:

> In connection with my request for indemnification and advance reimbursement of my reasonable costs and expenses, I state that as an officer and director of ClearOne, I have conducted myself in good faith at all times, and I reasonably believe as an officer and director of ClearOne, my conduct was in, and not opposed to, ClearOne's best interests.  Furthermore, I personally promise to repay any advancement of any reasonable expenses if it is ultimately adjudged that I did not meet the requisite standard of conduct.  My promise to repay the company is not conditioned or restricted in any manner, but constitutes a personal and unlimited general obligation.

1

Complaint, Ex. A.  ClearOne asserts that the representations were false.

Flood was convicted of all nine counts charged against her on February 27, 2009.  ClearOne characterizes the counts as "(a) conspiracy to willfully falsify ClearOne's books and records, (b) willfully making false statements in quarterly and annual reports, (c) willfully making and causing to be made misleading and false statements to ClearOne's accountants in connection with the accountants' audits, (d) securities fraud, and (e) perjury in connection with testimony given under oath in an official proceeding brought by the U.S. Securities and Exchange Commission in 2003 concerning the Debtor's conduct as an officer and/or director of ClearOne."  Complaint ¶15.  It asserts that  Flood's obligation to it to repay the costs and fees advanced is not dischargeable because her statement was false and she did not have the intent to repay the costs and fees if it sought repayment of them.  11 U.S.C. §523(a)(2)(A).[1]

Both parties seek summary judgment.  ClearOne asserts that Flood is collaterally estopped by her criminal conviction from contesting the nondischargeability of the repayment obligation. Flood asserts that the summary judgment record shows that ClearOne could not have justifiably relied on the statement.  Flood's motion will be granted and the complaint will be dismissed.


## The Underlying Misconduct

The basic fraud was misrepresenting ClearOne's sales, thus falsely increasing its income and inflating its stock price.  The applicable periods were the quarters ending March 31, 2001 through the quarter ending December 31, 2002.  ClearOne was publicly traded.

---

[1]ClearOne also asserted that Flood breached her fiduciary duty to it and that her conduct constituted securities fraud.  11 U.S.C. §§523(a)(4) (fraud while acting in a fiduciary capacity) and §523(a)(19) (violation of security laws). Those counts were previously dismissed.

ClearOne retained Miller Magleby & Guymon, P.C., as special litigation counsel in connection with the civil complaint filed by the Securities and Exchange Commission against ClearOne and four shareholder derivative lawsuits against various past and then-current officers and directors.    It made two reports to the Special Litigation Committee: (1) Report and Recommendations to the Special Litigation Committee dated October 12, 2003 concerning the civil complaint filed by the United States Securities and Exchange Commission and four shareholder derivative suits ("Derivative Report"), and (2) Report and Recommendations Regarding Indemnification dated October 15, 2003 ("Indemnification Report").  (Docket Entries 39-1 and 39-2, respectively).  The Derivative Report describes the revenue recognition issues:

> The gravamen of the SEC Case and the Derivative Actions is that the Company improperly recognized revenue on product that it had shipped to the Distributors .  .  . without fixed terms by which payment would be made.  Stated otherwise, the SEC Case and the Derivative Actions allege that there were illegal "side deals" which allowed the Distributors .  .  . to pay for product only when it was sold by them, and not within the 90-day terms established by the written agreements with ClearOne.

> In the course of implementing the Distributor model, ClearOne consulted with its auditor, [Ernst & Young].  The Company was told by E&Y that in order to properly recognize revenue, Generally Accepted Accounting Principles ("GAAP") required three elements: (1) title must pass to the buyer of the product sold; (2) there can be no right of return on the part of the buyer; and (3) there must be fixed payment terms.  A more complete discussion of the applicable GAAP principles is contained in the June 26, 2003, ClearOne Communications, Inc. Report to Audit Committee prepared by the accounting firm of Lake, Hill & Meyers.

Derivative Report at 7 (Docket Entry 39-1 at 9) (internal citations and footnotes omitted).

The fraud involved various elements:  pay-as-you-sell payment terms for the distributors; "sweeping the floor"; and "channel stuffing."  Each misrepresents the timing of a sale and distorts the revenue stream of ClearOne.  The pay-as-you-sell essentially converts a sale into a consignment. The distributor has no obligation to pay for the product until he sells it which is contrary to the third

criteria of a true sale necessary to recognize revenue.  The transaction falsely shows as a sale on

ClearOne's books and records, but its accounts receivables increase to the extent that the distributor

does not make a current payment.  Revenue on an accrual basis is enhanced.

Sweeping the floor refers to shipping everything in ClearOne's factory before the end of the

reporting period whether it was sold or not.  The distributors are coerced into accepting unwanted

product.  The result is that the maximum amount of product is moved out of the factory door and

counted as sold resulting in artificially inflated revenue.  This pattern is readily apparent to an

observer because the normal product inventory level is maintained for most of the quarter; is totally

depleted by a surge of shipments near the end of the quarter; and then restored to the normal

inventory level.  The pay-as-you-sell term of payment facilitated sweeping the floor.  The distributor

incurred no financial obligation in accepting the product.

Together, the pay-as-you-sell and sweeping the floor resulted in channel stuffing, that is,

excess product was pushed out of ClearOne down the distribution channel.  It was more product than

the distributors could reasonably sell and resulted in distributor inventory levels higher than they

would have chosen.  It also resulted in ostensibly more sales and greater revenue for ClearOne.

Over time, the process becomes increasingly difficult to stop.  The product pushed onto the

distributors to support revenue for the current quarter might otherwise have been purchased by the

distributors in the next or a subsequent quarter.  During the next quarter, more product must be

pushed to keep up the sales figures, which again results in a hole in a later quarter.  It is,  Flood

stated,  like being "hooked on heroin."[2]

---

[2]Timothy J. Morrison was Vice President of worldwide product sales from June 25, 2001 through February 4, 2003, and was deposed in *Lumbermens Mutual Casualty Company v. ClearOne Communications, Inc., et al.* on February 2, 2005.  He testified:

## Report and Recommendations
## of Miller Magleby & Guymon, P.C.
## (The Derivative Report)

Scott M. Huntsman and Larry R. Hendricks, two directors who were not named as defendants in the shareholder derivative litigation, were appointed as the Special Litigation Committee ("SLC"). The SLC retained Miller Magleby & Guymon, P.C. ("Special Counsel") to investigate the derivative lawsuits, and "in consultation with the Special Litigation Committee and with the Committee's input" prepared an 87-page report "to analyze and discuss the issues raised by the derivative complaints."  It is titled, "Report and Recommendations to the Special Litigation Committee of ClearOne Communications, Inc., from Miller Magleby & Guymon, P.C. (Special Litigation Counsel)" and is dated October 12, 2003.  Supplemental Briefing Stipulation and Consent Order, Ex. A. ("Derivative Report") (Docket Entry 39-1).  This section discusses the Derivative Report.

Special Counsel discussed the documents and materials it reviewed and considered in preparing its report with and for the Special Litigation Committee.  Special Counsel attached a 13-

---

Q.  Did the phrase hooked on heroine *[sic]* ever come up in that context?
A.  It did.
Q.  Who used that phrase?
A.  Frances Flood.
Q.  Did you hear her say that?
A.  Absolutely.
    .   .   .
Q.  Can you tell me the circumstances in which she used that phrase?
A.  She was growing very frustrated with the distributors because they had so much product and owed us so much money, and so she said that we got ourselves hooked on heroine *[sic]*, meaning that we were selling a lot of product through distribution, and we needed to get off of that and find a different way to get our revenue.
    .   .   .
Q.  How many times did Fran Flood talk to you about the phrase hooked on heroine *[sic]*, meaning trying to get off of pushing product on to distributors?
A.  That's what I said before, five, ten times, quite a number on different occasions.

Motion for Summary Judgment, Ex. B, Deposition of Timothy J. Morrison at 33-34 (Docket Entry 21-3 at 33-34).

page appendix of documents it reviewed. Derivative Report, Appx. B, "Documents and Materials

Reviewed by Special Counsel." The documents included numerous depositions in the SEC Case,

the transcript of the three-day hearing in the SEC Case for a preliminary injunction, interviews with

Flood and other directors and principals of ClearOne, and 18 declarations.

Special Counsel made a disclaimer with respect to its Derivative Report:

> The facts in this case, including the facts alleged in the derivative complaints and the SEC Case, extend from approximately March 2001 through December 2002, a period of nearly two years. During this time, numerous relevant events occurred, many of which are disputed by the various parties and witnesses involved.
>
> The duty of the Special Litigation Committee is not to make a final determination as to what did, or did not, occur. Such a determination, if one is to be reached, would be made by the ultimate trier of fact, whether it be a judge or jury. Rather, the Special Litigation Committee is charged with analyzing the evidence, and determining whether it is in the best interests of the Company to maintain the derivative proceedings(s) against any of the derivative defendant officers and/or directors, and whether to indemnify these same officers and/or directors.
>
> Thus, the following is a recitation of some, but not all, of the testimony, documents, and other evidence that relates to liability, damages, and collectibility. Development of all the possible evidence in this matter would take months or years, is beyond the scope of the Special Litigation Committee's charge, and is not necessary to reach the determinations at-issue. While it is not meant to be an exhaustive survey of all the possible evidence on any particular point or issue, the following includes the most significant evidence, and considers the positions likely to be taken by all sides in a derivative proceeding against any of the officers and/or directors. Many of the documents, statements, and testimony are subject to interpretation. Thus, to present a fair recitation, many of the documents, statements, and testimony are presented verbatim.

Derivative Report at 5.

The Derivative Report stated that the derivative complaints alleged that ClearOne

"improperly recognized revenue beginning in the fiscal quarter ending March 31, 2001 and

continuing thorough December 31, 2002." Derivative Report at 3. It continued:

> Among other things, the derivative complaints allege that ClearOne in

6

general, and Flood and Strohm in particular, engaged in "channel stuffing," a process by which large amounts of product are shipped to distributors in order to artificially inflate the Company's reported revenue. In addition, the allegation is made that large quantities of product were shipped by the Company at or near the end of fiscal reporting periods for the purpose of realizing revenue expectations for that reporting period. The derivative complaints make, in large part, allegations similar to those made by the United States Securities and Exchange Commission ("SEC"), which filed a civil complaint against the Company on January 15, 2003 (the "SEC Case"). The SEC Case involves many, although not all, of the issues raised in the derivative complaints, and thus the SEC Case is central to the discussion herein.

After filing its civil action, the SEC requested a preliminary injunction against ClearOne, and an evidentiary hearing was held on March 3, 4, and 5, 2003. Based upon the evidence presented at this preliminary hearing, the United States District Court, District of Utah, determined that "there is at least *prima facie* evidence that Flood had the requisite scienter" to violate the securities laws. The Court determined that "[a]lthough there is some weak evidence that Strohm knew of the 'pay-as-you-go' terms of distributors and customers, the Court cannot conclude on the evidence before it that there is a *prima facie* case that Strohm had an intent to manipulate, deceive, or defraud."

Derivative Report at 3-4 (footnotes and internal citations omitted).

ClearOne hired Strohm as Controller on February 29, 1996. She became Chief Financial Officer in 1997. The Board of Directors made Flood President of ClearOne in December 1997. She became a member of the Board of Directors at the same time. In 1998 she became the Chief Executive Officer. Derivative Report at 8. Timothy J. Morrison was hired by ClearOne on or about June 25, 2001 as Vice President for Sales. Derivative Report at 10.

In July 2000, Ernst & Young issued a letter to ClearOne concerning internal controls and accounting issues. "In that letter, E&Y advised ClearOne of the issuance by the SEC staff on December 3, 1999 of Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements* ("SAB 101"). Derivative Report at 9 (citation omitted).

Prior to January 2001 ClearOne operated on a manufacturer's representative model. From January through June 2001 there were discussions within the executive or management teams and

7

with the Board about changing from a manufacturer's representative model to a distributor model. ClearOne decided to make the change and began implementation of the change on June 13, 2001. The distributor agreements stated that title to the product passed at ClearOne's factory upon delivery there to the distributor, that there was no right of return, and that payment was required within 90 days. Derivative Report at 9. Morrison testified that starting with his first day on the job – about June 25, 2001 – there were side-deals and oral modifications to the distributor's agreements. The principal modification was that payment was not required within 90 days. Instead, the distributors could pay as they sold the product. Misty M. Chalk, the lead salesperson and who worked directly for Morrison, testified in her SEC interview that:

> Flood, Strohm, and Morrison all stated that Production Audio [a distributor] could "pay for it when they sold it," and generally testified that there was at least an understanding within the Company that the Distributors did not have to pay for product until it was sold. Chalk also testified that she "heard every single one of our executives tell Fran [Flood] you can't do this anymore, it's illegal."

Derivative Report at 11 (citations omitted). Chalk's SEC testimony was on January 13, 2003. Derivative Report, Appx. B at 4.

James Starin – the principal of Starin Distribution, Inc., one of the distributors – testified in an SEC deposition that Morrison initially told him that the payment terms were net 90 days. Starin replied that he would "do his best" but "that at the time of the first shipment, 'under those conditions there was no way I could meet those terms.'" Derivative Report at 12. "Starin testified that Morrison told [him] that he didn't have to pay for the product until [he] sold the product." Derivative Report at 12.

Angelo Skiparnius, the CEO of PT&T, another distributor, stated in his declaration to the SEC that he had a verbal understanding with Morrison that he did not have to pay for the product

until he sold it. "Skiparnius goes on to state that Flood was aware of these verbal agreements and that 'Flood discussed the verbal agreement in my presence and on conference calls with all ClearOne distributors.'"

> Skiparnius also states that it was his understanding, based on conversations with Flood and Morrison, that he "was not to discuss payment terms for [PT&T] inventory that differed from [the] written contract with ClearOne with any analyst" and that he was "instructed by Morrison to confirm [PT&T] accounts payable balance to ClearOne with ClearOne's independent auditor Ernst & Young, LLP without revealing the agreement with ClearOne that I [PT&T] could pay for my inventory as it sold to PT&T customers."

Derivative Report at 13. Skiparnius' SEC declaration was dated January 14, 2003. Derivative Report, Appx. B at 6.

Special Counsel reports that two more distributors stated to the SEC in declarations or in depositions that the 90-day payment term was not the operative agreement, that there was an oral agreement that they would pay for the product when they sold it. Michael Oltz stated in a declaration to the SEC, that on June 28, 2001,

> he participated in a conference call with Flood, Morrison and Starin, in which Flood discussed the payment terms under which distributors would take ClearOne products. According to Oltz, Flood stated that for purpose of "the accountants and legal requirements, ClearOne would require payment for shipments received by distributors in 90 days," and that "in writing there is a brick wall at 90 days, in practice there is not."

Derivative Report at 15.

Special Counsel and the Special Litigation Committee's investigation did not rely solely on the distributors. They also relied on statements from company employees. Peter Agricola, the National Sales Manager from April 1, 2002 through June 30, 2002, stated in his declaration to the SEC in which he stated that:

"ClearOne had under the table agreements with each of its distributors that provided

for payment terms very different from those in the agreements." Agricola states that at the end of each quarter, ClearOne would "dump inventory" on its distributors "with a verbal understanding that the distributors would not be required to pay for that extra inventory according to the terms of the written contracts with ClearOne". . . . Agricola does not state that Flood or Strohm, or any of the members of the Board, were aware of the "under the table agreements."

Derivative Report at 17 (internal citations omitted).

The Derivative Report continues:

Declarations were also submitted by Richard Charles Crowton, Jr., ("Crowton"), Kevin L. Davis ("Davis"), and Marlin Howell ("Howell"). Crowton states that ClearOne 'stuffed the channel' under Flood's direction during the quarter ending March 31, 2001, and that manufacturing would work "24/7 the last week or two of each reporting period to make as much product as they could" to be shipped. Davis states that Flood transferred Davis after he refused to agree with her revenue projections for the quarters ending March and July 2002, that Flood and Strohm were aware of the "channel stuffing," which was "common knowledge around the office" . . . Howell states that Howell "had heard" about product being "pushed on MCSI, Starin Marketing and possibly others." Howell also states that, at the direction of Jose Martinez, he placed product returned by Production Audio in some back buildings, so that ClearOne would not have to record the return on the books and "hurt their revenue numbers for the quarter."

Derivative Report at 17 (internal citations omitted).

The Derivative Report states that Distributor Certifications were signed by three distributors

on January 2, 2003 and January 3, 2003, in support of the written payment terms. Derivative Report

at 58-59. However, NewComm, one of the three distributors, added language to its certification.

It stated:

3.   However, Products were shipped to Distributor under terms of the "pay as you go" program, which required Distributor to pay for the Products as and when it sold. This program was established due to the newness of the distribution channel. This "pay as you go" program was an express oral understanding between ClearOne and Distributor.

4. All Products ordered or negotiated with ClearOne were considered by the Distributor to be saleable. Subsequent to taking delivery, Distributor discovered that some of the shipped Products were technically flawed. Distributor continues to

consider that some of the Products were technically flawed, and considers that it
should have the right to return such Products.

5. The only Products for which Distributor has not made payment within terms are
the Products shipped to Distributor under the "pay as you go" program.

Derivative Report at 59.   The distributor certifications were requested by ClearOne's lawyers,

according to Flood.  Derivative Report at 59.

On January 15, 2003, the SEC filed its Complaint against ClearOne.  On or
about January 18, 2003, Flood and Strohm were relieved of their day-to-day duties,
and were replaced by Rand and Keogh, who become [sic] co-chief executive officers.

On January 23, 2003, ClearOne issued a Press Release indicating that
Investors should not rely upon financial statements.   On February 4, 2003,
Morrison's employment was formally terminated, and made retroactive to
January 24, 2003.

Derivative Report at 61 (internal citations omitted).

The Derivative Report reflects differing opinions among members of the management staff

as to what transpired through the end of 2002, and who was responsible.  However, it clearly shows

that there were improprieties in revenue recognition.  The channel stuffing and pay-as-you-go

schemes were widely known within ClearOne and acknowledged directly or indirectly by the

distributors.

Special Counsel who prepared the Derivative Report analyzed the claims against the

directors and officers, first discussing the legal standard required to recover against officers and

directors and then analyzing the claims made in the shareholder derivative suits.  Derivative Report

at 63-74.  The first conclusion, of several, was that the Special Litigation Committee could consider

a multitude of factors in deciding whether to undertake litigation against ClearOne's officers and

directors.  A nonexclusive list of twelve factors that the Special Litigation Committee could consider

included:

1. The requisite legal standards to establish such claims;
2. The likelihood that the litigation would be resolved in the Company's favor;
3. The potential amount of a favorable judgment;
4. The litigation costs to obtain judgment;
5. Potential exposures to other litigation (including potential indemnification claims and counterclaims);
6. The potential collectibility of a favorable judgment;
7. The impact on other claims;
8. The effect of litigation on the Company's on-going business;
9. Loss of management time and energy;
10. Disruption of management, employees, and overall reduction in morale;
11. Possible adverse consequences relating to the Company's insurance coverage;
12. Adverse customer, banker, and stock market reaction.

Derivative Report at 64-65 (citations omitted).

Another conclusion addressed the standard of care necessary to be shown to have been breached. Special Counsel relied on Utah Code Ann. §16-10a-840 (2003) which it quoted in part.

Special Counsel concluded that:

> Stated otherwise, under Utah law, a director may be in *breach* of the director's duty of care for acting negligently, but will not be *liable* unless the director's action or inaction constitutes at least gross negligence, willful misconduct, or intentional infliction of harm. See Reedeker v. Salisbury, 952 P.2d 577, 583 n. 6 (Utah Ct. App. 1998) ("Section 16-10a-840(4)(b) of the Business Corporation Act protects a corporate director or officer from personal liability for corporate decisions unless his or her breach or failure to perform the duties of the office 'constitutes gross negligence, willful misconduct, or intentional infliction of harm on the corporation or the shareholders.'") (quoting §16-10a-840(4)(b) (1995)); Resolution Trust Corp. v. Hess, 820 F.Supp. 1359, 1365 (D.Utah 1993) ("It appears that on and after the effective date of [§16-10a-840], director liability by statute will be limited to 'gross negligence, willful misconduct or intentional infliction of harm on the corporation or its shareholders.'") (quoting §16-10a-840(4)(b)); 1993 UTAH SENATE JOURNAL 764 (Wednesday, March 3, 1993) ("The intent and purpose of [§16-10a-840] is to clarify and codify what is considered to be the existing common law of this state, as interpreted by judicial decision, that the standard of care for establishing corporate directors' and officers' personal liability has been and is gross negligence.").

Derivative Report at 66.

12

Special Counsel also reported that officers and directors could rely on others in the good faith discharge of their duties. Derivative Report at 67-70.

Special Counsel then presented its "Conclusion Regarding Derivative Claims." It first discussed six general considerations. The litigation would be costly and time consuming. It noted that there were already "thousands of pages of documents, exhibits, and testimony" and that "thousands more would be generated if the Company maintains the Derivative Actions. Summary disposition of the derivative claims in favor of the Company is, therefore, highly unlikely, and trial or extended litigation leading to a settlement would be expected." Derivative Report at 75. Special Counsel noted the need to retain experts, especially accountants. It estimated that legal and expert fees would both "run in the hundreds of thousands of dollars." *Id.* It expected that the claims would be "vigorously contested, and establishing liability is far from a certainty, especially in view of the conflicting evidence and testimony on each side of the central issues." *Id.* Special Counsel noted that in pursuing the litigation it would have to take positions inconsistent with those taken at the SEC hearing particularly with respect to the propriety of the recognition of revenue. *Id.* Special Counsel expected that all officers and directors would assert that they relied on Ernst & Young, ClearOne's accountants or on other officers or directors. Derivative Report at 76. Finally, Special Counsel noted that the Special Litigation Committee was:

> concerned about the impact litigation . . . might have on the Company's business. Although the committee is in a much better position to judge this effect, protracted litigation between the Company and its past and/or present officers and directors might well negatively affect the Company's status with the market, its vendors, customers and shareholders. Indeed, the SEC Case and other lawsuits have had an impact on public and customer perception."

Derivative Report at 76.

Special Counsel analyzed the prospects of suits against the outside directors, Derivative

13

Report at 76-80; and the three officers or inside directors, Wichinski, Strohm and Flood. Derivative

Report at 80-87. It concluded that derivative claims against the outside directors "would have a very

low likelihood of success." Derivative Report at 80. As to a claim against Wichinski, "Special

Counsel cannot recommend that the Company maintain the derivative proceedings against

Wichinski." *Id.* at 80. As to Strohm, Special Counsel opined that "the Company would face a

substantial hurdle in proving Strohm committed gross negligence. The challenge of establishing

gross negligence will be compounded by the reliance-on-others defense, which Strohm would

undoubtedly assert." *Id.* at 81. Special Counsel then discussed Strohm's financial circumstances.

Special Counsel opined that she "does not appear to have substantial assets to satisfy a judgment."

*Id.* The assets "are hardly substantial assets in light of the expense and uncertainties of litigation."

*Id.* Moreover, there would be no insurance coverage and Strohm would likely file bankruptcy

"soon after the litigation commenced." *Id.*

      Flood was different. The Derivative Report states:

> <u>Flood</u>.    Under any account, Flood presents the most challenging
> determination. Liability against Flood might be predicated on either (i) her knowing
> participation in schemes to improperly recognize revenue or "stuff the channel"; or
> (ii) her failure to act when a reasonable person would have recognized that there was
> a problem. The Court in the SEC Case noted, based upon the evidence presented at
> the Preliminary Injunction Hearing, that "[i]t is clear that the actions of Flood and
> ClearOne were the result of more than mere negligence."
>
>       There is some evidence of Flood's participation in "pay-as-you-sell" oral
> agreements with Distributors.  Most of this evidence, however, comes from
> Morrison. The difficulty in relying on Morrison's testimony is discussed above. In
> addition, Morrison' testimony on several key points is contradicted by others (and
> even by his own, later testimony). For example, in his January 8, 2003, testimony
> before the SEC, Morrison testified as follows:
>
> > I was in Fran Flood's office when Flood told both Starin and Oltz
> > separately on the phone that if they helped her out, they could pay as
> > they collected for the products when they sold them.  .  .  .  After

Starin agreed, Fran told him to put 90-day terms on the purchase order and to tell auditors or any outsiders that might call that our agreement was for 90-day terms.

Later, in response to cross-examination at the Preliminary Injunction Hearing, Morrison responded to questions regarding this conversation as follows:

> Q. And is it your testimony that also at that meeting Fran Flood told him that – not to worry because they didn't [have] to pay until they sold the product?
>
> A. I believe the way she phrased it to Mr. Starin was, "Don't worry about it, Jim. If I get hit by a truck tomorrow, Tim Morrison will know we're not going to come after you to pay this stuff. And then he said, "Good, because I couldn't pay it anyway."
>
> Q. So she said, "If I get hit by a truck, Tim Morrison is my witness that we're not going to come after you."
>
> A. That we won't come after you and ask you to pay the money.
>
> Q. So the terms, "pay as you sell" were not used, correct?
>
> A. Correct.
>
> Q. That's what Fran Flood said, according to your testimony is that, don't worry, we'll work with you, or words to that effect?
>
> A. Words to that effect.

In his deposition, Mr. Oltz testified that he did not recall a discussion in this particular telephone conference about paying for goods as they were sold:

> Q. In Paragraph 12, where it says, "Both Starin and I were told that we did not have to pay for the initial shipments until the products sold to third parties," is that something Mr. Morrison told you?
>
> A. I – not at that time. I am not certain – I'm not certain that the qualification of paying until products were sold – I will go one further than that.
>
> At this telephone – at this conference call between Morrison, Flood, Starin, and myself, I do not remember there being a discussion about paying for the goods when they were sold to any third parties.

What we were told is that, if we had difficulty paying for this first shipment, not to worry about it.

Q. Did you understand that to mean that they would work with you?

A. I understood that to mean just what I said.

There is some evidence, not dependent on Morrison, which suggests Flood's knowledge of, or participation in, "pay as you sell" side agreements. For example, in his deposition, NewComm's David Francis testified that during a May 2002 meeting in Park City, both Flood and Morrison informed the Distributors not to disclose the "pay as you go program" to analysts. Although he later stated that he wasn't sure if the phrase "pay as you go" was used, he had "no doubt in [his] mind we were clearly told not discuss the pay as you go program. We were to tell people we were paying net 60."

Derivative Report at 82-84  (internal citations and footnotes omitted).

At this point, the authors of the Derivative Report added footnote 25 which states:

There is support for the claim that Flood knowingly participated in the development and maintenance of "pay as you sell" agreements in some of the declarations filed in the SEC Case. For example, in his Declaration, Angelo Skiparnias stated that "Fran Flood . . . was well aware of the verbal agreement that Gentner/ClearOne had with me and the other distributors to pay for products only as we sold them. Flood discussed the verbal agreements in my presence and on conference calls with all ClearOne distributors." Such statements, however, are conclusory, were not made with the opportunity of others to cross examine, it is unknown if the language selected originated with the declarant or other(s), and in several circumstances, the declarant's testimony under cross examination changed the import of the earlier declaration. In the case of Mr. Skiparnias, in his deposition, he pointed principally to Morrison as the source of the pay-as-you-go arrangement.

Derivative Report at 84 n 25.

The Derivative Report then continues:

Similarly, there is some evidence that Flood failed to act in light of information which should have alerted her to a problem. Perhaps the most compelling example of this is the Scott Wysota transaction. Flood explained her involvement in the Wysota transaction as follows:

[Tim Morrison informed me that he knew] a guy in New York, he is

16

married to a lawyer, he has all these contacts in the legal community,
and those guys would be willing to become distributors.  And so he
actually approached me with the idea.

As a result, Flood had only a "five minute" conversation with Wysota.
Subsequently, Mr. Wysota was shipped $500,000 of inventory and that transaction
was reflected as revenue on ClearOne's books.

Even assuming that Flood had no knowledge of a scheme to use Wysota as
an outlet for product, the fact that Wysota had no prior experience in the industry,
had no company or place of business, and was merely a friend of Morrison's who
had "contacts" within the legal community, created a situation that arguably required
more investigation prior to the shipment of $500,000 of product to Wysota.  On the
other hand, it is a virtual certainty that Flood would defend by arguing that she relied
upon Morrison, a highly-paid executive who was primarily responsible for the
Company's product sales, to conduct due diligence on the transaction.  Whether such
conduct would be classified as "gross negligence" is not at all definite.

It should be noted that in her interview, Flood presented herself well.  It is
anticipated that she would be a credible witness.  In addition, Flood presented
alternative versions of documents and events which, at first blush, appeared
problematic for her.  For example, in response to a question as to what was meant by
the comment that the company was addicted to heroin and needed to go "cold
turkey" in the "last move on the chessboard" email, Flood replied:

I felt that what we were doing is giving these guys products, and they
were only selling the products that were easy to sell, and they weren't
selling the other products that they should have been selling.  In other
words, we got ourselves on heroin, they were getting all these –
everybody is making revenue, they are making easy money because,
you know, they are just selling the products that they feel they can
sell, and they weren't selling the products that they should have been
selling in addition to those easy products.

Although the $2,000,000 software purchase order with MCSI is a transaction
out-of-the-ordinary, and was not adequately explained, it does not establish direct
knowledge or participation in the alleged side deals.  Furthermore, it was never
placed on the Company's books and records, or asserted by MCSI as a valid
purchase order at or about the time it was issued, lending some support to Flood's
explanation.

Based on the disputed evidence, the Company would have difficulty
establishing that Flood committed ***gross negligence***.  Flood, like Strohm and the
other derivative defendants, would assert her reliance upon E&Y (and Strohm,

17

Morrison, and/or others) as a defense.

It should also be noted that Flood appears not to have sold any Company stock or otherwise personally benefited from the alleged improper revenue recognition activities, other than for salary increases and bonuses.

In considering whether to pursue litigation against Flood, the Company should also consider the impact of Flood's employment agreement and her financial condition.

The Flood Employment Agreement provides for a base annual salary of $300,000 from August 1, 2003 to July 31, 2004 and $325,000 from August 1, 2004 to July 31, 2005. Pursuant to paragraph 6.2, if Flood's employment is terminated without "cause," as that term is defined in the Agreement, Flood is entitled to continue to receive her full monthly salary and health and life insurance premiums for the remaining term of the Agreement. Cause is defined in paragraph 6.1 as "willful misconduct, breach of fiduciary duty involving personal profit, intentional failure to perform stated duties which failure is not reasonably cured within ten (10) days after receipt of written notice from the Company, willful violation of any law, rule or regulation (other than traffic violations or similar offenses) or final cease-and-desist order or material breach of any provision of this Agreement." The Company should expect that any action against Flood that involves a termination of her employment will likely engender a counterclaim by Flood under her employment agreement.

With respect to Flood's ability to satisfy a future judgment, Flood has provided to Special Litigation Counsel the following unverified financial statement:

[Financial Statement omitted]

For the reasons stated, it is not in the Company's best interest to maintain the derivative proceedings against Flood. Special Litigation Counsel does believe, however, that resolution of the Company's potential claims against Flood and Flood's potential claims against the Company (e.g., those for indemnification and those arising under her employment agreement) without litigation is in the Company's best interest. As with Strohm, as part of any such resolution, we recommend that Flood be required to verify her financial condition to the Company, in writing and under oath, with appropriate repercussions if her representations are later determined to be false.

Derivative Report 84-87 (internal citations and financial statement omitted; emphasis added to "gross negligence").

## Report and Recommendations Regarding Indemnification
## from Miller Magleby & Guymon, P.C.
## (The Indemnification Report)

Special Counsel prepared a second report titled "Report and Recommendations Regarding Indemnification to the ClearOne Communications, Inc. Special Litigation Committee from Miller Magleby & Guymon, P.C. (Special Litigation Counsel)" and was dated October 15, 2003. Supplemental Briefing Stipulation and Consent Order, Ex. B. ("Indemnification Report") (Docket Entry 39-2). This section discusses the Indemnification Report. The Indemnification Report is dated three days after the Derivative Report and is much shorter at nine pages.  The Indemnification Report begins with the question presented to the SLC:

> The Special Litigation Committee has been charged with making the following determination:

> Should ClearOne Communications, Inc. . .  . indemnify any of the derivative defendant officers and/or directors under Utah Code Ann. §16-10a-901, *et seq.*?

Indemnification Report at 1.  The report recites that the SLC retained Special Counsel

> to assist in addressing this issue.  Among other things, [Special Counsel] reviewed tens to hundreds of thousands of pages of documents, conducted live interviews with certain of the Company's officers and directors, and sought input from counsel for the derivative plaintiffs and potential parties, as well as from witnesses to certain of the key events and facts.

*Id.*

Special Counsel discussed the requirements for indemnification and noted that a corporation could not indemnify a director unless the director met the statutory standard of conduct, a negligence standard.  "This standard is different from the statutory gross negligence standard necessary to establish liability."  Indemnification Report at 2.  In short, in order for the derivative plaintiffs to recover, they had to show that the officers and directors were grossly negligent.  However, the

19

officers and directors would be disqualified from being indemnified if they were only negligent.  In order to be indemnified, the officer or director had to satisfy the negligence standard, have acted in good faith, reasonably believed that his conduct was in, and not opposed to, the corporation's best interests and, in the case of a criminal proceeding, have no reasonable cause to believe his conduct was unlawful.  Indemnification Report at 2.

The Indemnification Report addressed advancement of expenses which ClearOne is seeking to recover in this adversary proceeding.  The Indemnification Report states:

> To obtain advancement of costs, the petitioning directors and/or officers must follow particular procedures.
>
> First, the director is required to furnish the corporation with "(a) .   .   . a written affirmation of his good faith belief that he has met the .   .   . standard of conduct [and] (b) a [promissory note] to repay the advances if it is ultimately determined that he did not meet the standard of conduct." .   .   . The petitioning defendants have met this procedural requirement.
>
> Second, if the director furnished the appropriate documents, the determining body must decide, "that the facts then known to [the determining body] would not preclude indemnification under this part." .   .   . Stated otherwise, the determining body (here, the Special Litigation Committee) must conclude that the facts then known would not preclude a determination that the petitioning officer/director defendant acted (1) in good faith, and (2) under a reasonable belief that the actions were in, or not opposed to, the best interests of the corporation.  If the determining body decides these issues in the affirmative, then the body may authorize advancement of defense costs.
>
> The final determining factor in deciding whether to indemnify and/or advance expenses is the language of the corporation's governing documents.

Indemnification Report at 6 (internal citations, footnotes and financial statement omitted).

In discussing ClearOne's corporate documents, Special Counsel concluded, with one exception, that the corporate documents generally followed the Indemnification Statutes.  The exception was that the Indemnification Statutes made indemnification permissible while the bylaws

Case 13-01149-RGM   Doc 49   Filed 06/02/14   Entered 06/02/14 10:49:18   Desc Main
Document      Page 21 of 31

made it mandatory.  The Indemnification Report states:

> under the Bylaws, ClearOne is <u>required</u> to indemnify a director if the determining body decides indemnification is permissible and authorized .   .   .
>
> [This] distinction is noteworthy because under the Indemnification Statutes, the corporation has discretion to indemnify an officer/director defendant.  By contrast, under the Bylaws, ClearOne must <u>always</u> indemnify a director if indemnification is "permissible and authorized," meaning if the "conduct was in good faith" and the party requesting indemnification "reasonably believed that his conduct was in, or not opposed to, the corporation's best interest." .   .   . Although the Bylaws require indemnification if the standard is met, the Company obviously retains the ability to make the conclusion as to whether the standard of conduct was met in the first instance.

Indemnification Report at 7.[3]

> Under the heading, "Indemnification Conclusions," the Indemnification Report states:

> For similar reasons as given with regard to the decision not to pursue derivative claims against the Outside Directors .   .   . and Wichinski, the Company should indemnify these individuals to the extent allowed by law.  As discussed in the Derivative Report, evidence of any direct role in, or knowledge of, the alleged "pay as you sell" side agreements is sparse to non-existent. .   .   .

> Indemnification of Flood and Strohm is not as easily decided.  As discussed in the Derivative Report, there is some evidence that Strohm was aware of at least MCSI's contention it had a "pay-as-you go" agreement, and other alleged improper activity.  The evidence against Flood is more compelling than against Strohm.  Both could and would argue, however, that they acted in "good faith" and reasonably believed they did so in the best interests of the Company.  If the Company declines to indemnify Flood and Strohm, both will likely sue the Company for indemnification and the advancement of defense costs.

> Special Litigation Counsel recommends that the Company attempt to resolve the Flood and Strohm indemnification demands without litigation, in the context of

---

[3]ClearOne appears to argue that it was required to indemnify Flood if she made the requisite undertaking. Plaintiff Clearone Communication Inc.'s Memorandum of Law in Support of Motion for Summary Judgment on the Issue of Nondischargeability at 16-17 (Docket Entry 19).  *But See* Plaintiff's Supplemental Reply Memorandum of Law in Support of Motion for Summary Judgment on the Issue of Nondischargeability at 2-3 (Docket Entry 47). This argument is contrary to Special Counsel's conclusion.  It is accurate to say that without Flood's undertaking, ClearOne could not have advanced her defense costs and fees, but it is not accurate to say the ClearOne was required to advance them if she made the undertaking.  Once the undertaking was made, ClearOne still could deny the request if it reached the conclusion that the she had not met the standard of conduct in the first instance.  Indemnification Report at 7.

the other potential claims and counterclaims between these parties.

Indemnification Report at 8.

The Indemnification Report's conclusion was:

IV.    CONCLUSION

Special Litigation Counsel recommends that it is appropriate to indemnify the
Outside Directors and Wichinski, in particular by advancing expenses, and to resolve
Flood and Strohm's demands through negotiation, and in conjunction with other
issues between Flood, Strohm, and the Company.

Indemnification Report at 9.

## Special Litigation Committee's Instructions
## to Parsons Behle & Latimer, Litigation Counsel

The Special Litigation Committee gave its instructions concerning Flood's request for

indemnification to its litigation counsel, Parsons Behle & Latimer by letter dated October 13, 2003.

Letter dated October 13, 2003 to Raymond J. Etcheverry ("Letter") (Docket Entry 39-3).  The Letter

recites the SLC's investigation and analysis, its consideration of Special Counsel's Derivative

Report and its consideration of the impact on ClearOne.  It stated four conclusions:

1.  The derivative claims against the outside directors and Randall Wichinski
do not have a sufficient likelihood of success to warrant the prosecution of such
claims. .   .   .

2.  The Committee does not believe that the derivative claims against Francis
Flood and Suzie Strohm have the requisite likelihood of success to warrant the cost
and expense of protracted litigation. .   .   .

3.  The Committee does not believe Flood and Strohm have the assets to
justify litigation.

Another major decision is collectibility.  Neither Ms. Flood nor Ms. Strohm
have substantial assets.  We believe that these assets would be depleted, at least in
part, by litigation costs.  There is also a possibility that Ms. Flood or Ms. Strohm
could file personal bankruptcy.

Thus, even if the Company were successful at trial, based on the financial information provided by Ms. Flood and Ms. Strohm, there would be insufficient assets from these potential defendants to satisfy any meaningful judgment.

4.  Protracted litigation with its former officers and directors would cause damage to the Company's business. .  .  .

Accordingly, as the Company's litigation counsel, you are authorized to proceed as you best see fit to do the following: (1) obtain sufficient verification of the assets of Ms. Flood and Ms. Strohm (perhaps by sworn statements with sufficient penalties for inadequate disclosure); (2) coordinate the dissemination of the Committee's decision and Counsel's Report; (3) negotiate and resolve claims and potential claims between the Company and Ms. Flood and Ms. Strohm; and (4) pursue resolution of the derivative lawsuits.

Letter at 3-4.


## Standard for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *In re Derivium Capital LLC*, 716 F.3d 355, 360 (4th Cir. 2013) (citing Fed. R. Civ. P. 56(a)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entity of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986).  A court considering a summary judgment motion must view the facts in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam).  This case involves cross-motions for summary judgment, which the court considers "individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).


## Standards for Nondischargeability

23

<u>Collateral Estoppel.</u>

ClearOne's Count I asserts that the debt owed by Ms. Flood to ClearOne is nondischargeable under § 523(a)(2)(A) as a false representation.  To prevail under this section, ClearOne must prove (1) a false representation, (2) knowledge that the representations was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages. *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 218 (4th Cir. 2007).

The doctrine of collateral estoppel applies in discharge exception proceedings. *Grogan v. Garner*, 498 U.S. 279, 285 n.11, 111 S.Ct. 654, 658 n.11 (1991).  When determining whether collateral estoppel arising from a federal judgment applies, the court applies the federal collateral estoppel doctrine.  *National American Ins. Co. v. Ruppert Landscape Co., Inc.*, 122 F. Supp. 2d 670, 676 (E.D. Va. 2000) (citing *Shoup v. Bell & Howell Co.*, 872 F.2d 1178, 1179 (4th Cir. 1989)).  The proponent must show:

1. the issue sought to be precluded is identical to one previously litigated;
2. the issue must have been actually determined in the prior proceeding;
3. determination of the issue must have been a critical and necessary part of the decision in the prior proceeding;
4. the prior judgment must be final and valid; and
5. the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum.

*Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998).

<u>Justifiable Reliance.</u>

One of the elements that ClearOne must prove is that it justifiably relied on Flood's fraudulent misrepresentation.  *Field v. Mans*, 516 U.S. 59, 77, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).  "'Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of

24

conduct to all cases.'" *Id.* (citing Restatement (Second) of Torts §545A, cmt. b (1976)). While a plaintiff is not ordinarily required to conduct an investigation, a duty to investigate can arise when surrounding circumstances of which the plaintiff is aware raise red flags that merit further investigation. *See Field*, 516 U.S. at 72, 116 S.Ct. 437; *In re Sharp*, 340 Fed. Appx. 899, 907 (4th Cir. 2009). This analysis is based on "an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." *Field*, 516 U.S. at 72, 116 S.Ct. 437 (citing W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on Law of Torts § 108 (5th ed. 1984)). "Thus, when the circumstances are such that they should warn a creditor that he is being deceived, he cannot justifiably rely on the fraudulent statements without further investigation." *Sharp*, 340 Fed. Appx. at 907. In this case, ClearOne conducted an extensive investigation before deciding to advance Flood's defense costs. It cannot ignore the results of that investigation.

## Discussion

The court is not called upon to decide whether ClearOne could have, in light of the circumstances and facts known, justifiably relied on Flood's statement without having undertaken an investigation. ClearOne undertook an investigation. What it learned as a result of its investigation must be taken into account in determining whether it justifiably relied on Flood's statement.

The Derivative Report and the Indemnification Report raise numerous questions as to the accuracy of Flood's statement. The Derivative Report states that distributors testified or made statements adverse to Flood. Corporate employees testified or made statements about the obvious

effect of the pay-as-you-go scheme, such as the shipment of all inventory at the end of each quarter

and the significant increase in accounts receivable.   There is the advice of Special Counsel to

advance defense costs to all the officers and directors except Flood and Strohm.   Special Counsel

recommended that ClearOne resolve Flood's "demands through negotiation, and in conjunction with

other issues between Flood . . . and the Company."   Indemnification Report at 9.   The other claims

involved employment contract claims.

The Special Litigation Committee, expressly relying on the Derivative Report and the

Indemnification Report directed Parsons Behle & Latimer, ClearOne's general litigation counsel,

to:

> (1) obtain sufficient verification of the assets of Ms. Flood and Ms.
> Strohm (perhaps by sworn statements with sufficient penalties for
> inadequate disclosure); (2) coordinate the dissemination of the
> Committee's decision and Counsel's Report; (3) negotiate and
> resolve claims and potential claims between the Company and Ms.
> Flood and Ms. Strohm; and (4) pursue resolution of the derivative
> lawsuits.

Derivative Report at 4.

The most difficult matter for ClearOne to overcome is the Memorandum Decision and Order

entered by the United States District Court for the District of Utah in *Securities and Exchange*

*Commission v. ClearOne Communications, Inc., Frances M. Flood, and Susie Strohm,* Case No.

2:03CV55K (D.Utah March 14, 2003).   Supplemental Memorandum in Support of Objection to

Plaintiff's Motion for Summary Judgment, Exhibit G (Docket Entry 44-1) (SEC Memorandum

Opinion).   In its Conclusions of Law, the District Court stated:

> [T]he court concludes that the SEC has made out a prima facie case that ClearOne's
> revenue recognition policies violate the federal securities laws.   Although ClearOne
> auditors were told that ClearOne applied GAAP in the context of revenue
> recognition, ClearOne did not properly apply these principles as a result of the oral

26

agreements that allowed payment to occur when the distributor or reseller sold and was paid for the product.

Memorandum Opinion at 12.

ClearOne also argues that there is no basis for distributors to claim that they were released from the terms of their Distributor Agreements. The agreements have an integration clause and a requirement that any amendment be in writing. .   .   . Defendants' arguments do not defeat the SEC's prima facie showing that the oral agreements occurred, the distributors and ClearOne were operating under these terms, and the agreements resulted in misrepresentations regarding revenue.

Memorandum Opinion at 13.

Scienter is an element that the SEC must establish as to some of its causes of action but not for others. .   .   .

The Supreme Court has defined scienter as 'mental state embracing intent to deceive, manipulate or defraud.' *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976). The state of mind of Flood, Strohm, Morrison, and persons exercising control over ClearOne can be imputed to the company. *Knox v. First Security Bank of Utah, N.A.,* 206 F.2d 823, 826 (10th Cir. 1953). Accordingly, ClearOne can be held liable for these violations on the same basis as the individual defendants.

As detailed in the findings of fact above, there is at least prima facie evidence that Flood had the requisite scienter. Distributors testified that Flood implemented oral agreements with respect to the channel stuffing, and spoke to them about payment arrangements that were at odds with the written distributor agreements. There is evidence that Flood knowingly filed false or misleading financial statements with the SEC and that Flood made false and misleading statements to analysts and the public. It is clear that the actions of Flood and ClearOne were the result of more than mere negligence. *SEC v. Haswell,* 654 F.2d 698, 700 (10th Cir. 1981). Therefore, the SEC has made a prima facie showing of scienter on the part of Flood and ClearOne.

Memorandum Opinion at 14-15.

On December 4, 2003, the SEC litigation was resolved with consent orders with all of the

defendants. None admitted liability. The derivative suits were also settled on December 4, 2003

with the payment of $5 million and the issuance of 1.2 million shares of common stock. *ClearOne*

*Communications, Inc. v. Lumbermens Mutual Casualty Company,* Case No. 2:04-CV-00119 TC

Case 13-01149-RGM   Doc 49   Filed 06/02/14   Entered 06/02/14 10:49:18   Desc Main
Document     Page 28 of 31

(D.Utah October 21, 2005) (Docket Entry 41-4) at 8-9.  *See also* Employment Separation Agreement at ¶15 (Docket Entry 41-2) (obligation to sign settlement documents in SEC Action by December 5, 2003).

These findings and conclusions were re-enforced by the findings and conclusions in *ClearOne Communications, Inc. v. Lumbermens Mutual Casualty Company,* Case No. 2:04-CV-00119 TC (D.Utah October 21, 2005).  In this case, Lumbermens which had issued a directors and officers liability insurance policy to ClearOne sued to rescind the insurance contract asserting that it had relied on ClearOne's financial statements in issuing the policy and those statements were false and misleading.  The District Court granted its motion for summary judgment, finding that the financial statements were false and that Lumbermens relied on them in issuing the insurance policy. The court reviewed the manner in which the financial statements were inflated, the statements of the distributors and of the principal officers.  It found that there were no material facts in dispute and granted summary judgment.  *ClearOne v. Lumbermens,* Order and Memorandum Decision.

Flood was indicted on July 25, 2007 and convicted on February 27, 2009.  ClearOne Communications, Inc. Motion for Summary Judgment at ¶¶9 and 17.

It is true that the SEC order addressed a motion for a preliminary injunction and only found that a *prima facie* case had been made by the SEC against ClearOne and Flood.  The court also recognizes that in settling the SEC suit, neither ClearOne nor Flood admitted liability.  However, the test for justifiable reliance is what ClearOne knew when it advanced Flood's defense costs, more particularly, did it justifiably rely on Flood's undertaking in making the payments.

The derivative suits were filed on June 30, 2002.  *ClearOne v. Lumbermens,* Order and Memorandum Decision, Docket Entry 41-4 at 9.  *But see* Derivative Report at 1 ("On the heels of

the SEC action, ClearOne shareholders filed at least four (4) separate derivative lawsuits."). The SEC action was filed on January 15, 2003. Derivative Report at 1. Trial on the motion for a preliminary injunction and other relief was held on March 3, 4 and 5, 2003. SEC Memorandum Decision at 1. The SEC Memorandum Decision and Order was dated March 14, 2003. The filing of the derivative actions and SEC action and the trial in the SEC action all preceded Flood's August 27, 2003 request for advanced indemnification.

The Derivative Report dated October 12, 2003, the Indemnification Report dated October 15, 2003 and the letter of instruction to general litigation counsel dated October 13, 2003, all followed Flood's request for advanced indemnification but before most of the money was advanced.[4] The reports were made for the purpose of deciding whether to prosecute the derivative actions and whether to indemnify ClearOne's officers and directors. Flood correctly concludes that ClearOne did not rely in any way on her undertaking for the payments made before she made her undertaking.

ClearOne did not justifiably rely on Flood's undertaking in advancing her defense costs. It simply knew too much and what it knew raised serious questions as to the accuracy of her statement in her undertaking. ClearOne knew enough soon after January 15, 2003, to place Flood on an administrative leave of absence after the SEC action was filed on January 15, 2003. Employment Separation Agreement (Docket Entries 18-8 and 41-2). The filing of the SEC action raised serious questions as to Flood's actions. ClearOne knew too much by March 5, 2003, the conclusion of the hearing on the SEC's petition for a preliminary injunction. The District Court concluded that the SEC made a *prima facie* case that Flood had the necessary scienter, a finding at odds with her later

---

[4]According to Flood's affidavit, only one payment for $80,764.69 was made after she submitted her undertaking and before the date of the Derivative Report. Docket Entry 41, Ex. C. All the rest were on or after the date of the Derivative Report.

29

statement that ClearOne says it justifiably relied on.  In order to justifiably rely on Flood's

statement, it had to resolve the serious questions concerning its accuracy.  It appointed a Special

Litigation Committee and commissioned an investigation by Special Counsel.  ClearOne acquired

more information during the investigation conducted by Special Counsel and the SLC.  The

challenges to the accuracy of Flood's statement came from numerous documents, depositions,

declarations and interviews of members of the executive group, other employees of ClearOne and

distributors.  While the reports suggest reasons why the derivative plaintiffs might fail to make their

cases and the defenses that Flood and the other defendants could raise, the fair reading of the reports

leads to the conclusion that there had been misconduct and that Flood was, by all accounts, at the

center of it.  The two reports, rather than resolving the accuracy problems with Flood's statement

in her undertaking, underscore the statement's unreliability.  In fact, rather than recommending

indemnification for Flood – as it did for all the other officers and directors except Strohm – it

recommended that ClearOne reach a global settlement with Flood.  ClearOne did that.  It settled the

derivative actions and the SEC action and reached a global settlement with Flood, which included

indemnification, all by the beginning of December 2003.  *See* Employment Separation Agreement

(Docket Entries 18-8 and 41-2).[5]


### Conclusion

ClearOne did not justifiably rely on Flood's statement in her undertaking.  A careful review

of the summary judgment record shows no genuine dispute as to a material fact.  ClearOne engaged

---

[5]Entering into a global settlement with ClearOne, the Employment Separation Agreement dated December 5, 2003,did not exonerate Flood from her undertaking.  Indeed, her undertaking is specifically included in Recital G which is itself incorporated into Paragraph 8.  The question is whether ClearOne justifiably relied on the representations in the undertaking.

in misconduct that artificially inflated its revenue.  The information that ClearOne knew before it made advances to indemnify Flood and after her statement raised numerous questions about her involvement that had to be – and never were – satisfactorily resolved before ClearOne could justifiably rely on her statement.[6]  Flood's motion for summary judgment will be granted and ClearOne's motion for summary judgment will be denied.

Alexandria, Virginia
June 2, 2014

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Sam J. Alberts
Richard G. Hall
19201

---

[6]ClearOne suggests that Flood's statement that she would repay any advanced costs was false because at the time that she made the statement she had no intent to repay any advanced costs that had not been properly advanced. The issue here is not justifiable reliance, but reliance itself.  In the Special Litigation Committee's letter of October 13, 2003, to general litigation counsel, the Special Litigation Committee stated that:

> Another major decision is collectibility. Neither Ms. Flood nor Ms. Strohm have substantial assets.  We believe that these assets would be depleted, at least in part, by litigation costs.   There is also a possibility that Ms. Flood or Ms. Strohm could file personal bankruptcy.

> Thus, even if the Company were successful at trial, based on the financial information provided by Ms. Flood and Ms. Strohm, there would be insufficient assets from these potential defendants to satisfy any meaningful judgment.

Letter at 3.

> Flood's unverified financial statement was included in the Derivative Report.  Derivative Report at 86.

> In light of Flood's known financial circumstances, ClearOne cannot now assert that it relied on her promise to repay, if called upon.